115 T.C. No. 38


UNITED STATES TAX COURT


FPL GROUP, INC. AND SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5271-96.                    Filed December 13, 2000.


     F, a regulated electric utility, is a wholly owned
subsidiary of P.  F is required to follow prescribed
regulatory rules for regulatory accounting and
financial reporting purposes.  In preparing its
consolidated tax returns for the years in issue, P
characterized F's expenditures by using the same
characterization that F used for regulatory accounting
and financial reporting purposes.  In an amended
petition, P sought to recharacterize as repair
expenses, expenditures which it had characterized as
capital expenditures for tax purposes.

     <u>Held</u>:  P's method of accounting for tax reporting
purposes was to characterize the expenditures in issue
consistently with the method that F used for regulatory
accounting and financial reporting purposes.  By
seeking to alter the method which it used to
characterize expenditures, P is attempting to change
its method of accounting.  P has failed to obtain the
consent of the Secretary to change its method of

accounting under sec. 446(e), I.R.C.; therefore, P is not entitled to the claimed expense deductions.

Robert Thomas Carney, for petitioner.

Gary F. Walker, Sergio Garcia-Pages, and Robert W. Dillard, for respondent.

OPINION

RUWE, Judge:  This matter is before the Court on respondent's motion for partial summary judgment filed pursuant to Rule 121.[1]  The sole issue presented is whether petitioner's attempt to recharacterize as repair expenses, expenditures which it had characterized on its tax returns as capital expenditures for the taxable years 1988 to 1992, is an impermissible change in accounting method under section 446(e).

## Background

FPL Group, Inc. (petitioner) is a corporation organized and existing under the laws of the State of Florida with its principal office located in Juno Beach, Florida.  Florida Power & Light Co. (Florida Power) is a wholly owned subsidiary of

_____

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

petitioner.  Petitioner filed consolidated returns with Florida Power during the years in issue.

On December 28, 1995, respondent issued a notice of deficiency for the taxable years 1988 through 1992.  In its First Amended Petition, filed May 13, 1996, petitioner argued for the first time that respondent erred in failing to allow a deduction for certain repair expenses related to Florida Power when determining the deficiency amounts in the notice of deficiency. Petitioner claimed that it had improperly characterized the following expenditures related to Florida Power as capital expenditures and that it should have deducted them as repair expenses:

| Year | Amount |
|------|--------|
| 1988 | $35,324,412 |
| 1989 | 52,115,791 |
| 1990 | 54,746,820 |
| 1991 | 56,823,897 |
| 1992 | 11,914,614 |
| Total | 210,925,534 |

Petitioner did not file a Form 3115, Application for Change in Accounting Method, with respondent to request a change in accounting method for the expenditures at issue.  Respondent did not raise the change in accounting method issue prior to the filing of his motion for partial summary judgment.

Florida Power owns and operates fossil and nuclear electric generating plants in Florida and also owns interests in coal-fired electric generating plants in Georgia and Florida, which

are operated by other utilities. Florida Power provides public electric utility services in Florida.  Florida Power is subject to the regulatory rules of the Federal Energy Regulatory Commission (FERC) and the Florida Public Service Commission (FPSC).  The FERC regulates the rates that Florida Power may charge to its wholesale customers.  The FPSC regulates the rates that Florida Power may charge to its retail customers.

For regulatory purposes, property at Florida Power's electric generating plants (electric plants) is considered as consisting of "retirement units" and "minor items of property". A retirement unit is the overall unit of property while the minor items of property are the associated parts or items which compose a retirement unit.  Examples of retirement units include air-conditioning systems, bridges, elevators, and cars.  The regulatory rules determine which expenditures at Florida Power's electric plants are capitalized and which expenditures are expensed for regulatory accounting purposes.  Expenditures for the addition or replacement of a retirement unit are required to be capitalized, while the replacement of a minor item of property is generally deducted as a repair expense.[2]  Florida Power, as a

_____

[2]Under regulatory accounting, expenses that are capitalized are taken into the capital base for ratemaking purposes (i.e., they receive an allowed "rate of return" on capital investment). On the other hand, expenditures deducted as current expenses are passed on to customers (and, therefore, reimbursed dollar-for-dollar) in the allowed rates.

regulated electric utility, is required to follow regulatory accounting for financial reporting purposes.

The FERC publishes a Uniform System of Accounts (USOA) which contains a standard set of accounts, rules, and regulations. Florida Power, as a major electric utility, is required to follow the USOA. The FPSC also requires Florida Power to follow the USOA. For regulatory accounting purposes, the FERC also publishes a list of Units of Property for Use in Accounting for Additions and Retirements of Electric Plant (FERC list), which is separate from the USOA. The units of property identified in the list are referred to as retirement units. The FERC list of retirement units may be expanded by any utility without other authorization by the FERC, but no retirement unit may be larger in size than those identified in the FERC list. The FERC list may not be condensed, but a subdivision or addition of other units is permitted.

The FPSC authorizes an expanded list of retirement units (FPSC list) beyond those prescribed by the FERC. The FPSC has the discretion to authorize a list of retirement units in which the retirement units are larger in size than the corresponding FERC retirement units. Florida Power could add retirement units to the FPSC list or expand the size of existing retirement units, but it had to notify the FPSC semiannually of these changes. Increasing the size of retirement units would increase the amount

of costs charged to expense, while decreasing the size of retirement units would increase the amount of capitalized costs.

During the years in issue, petitioner utilized the FPSC requirements for regulatory accounting purposes. Florida Power made more than 450 changes between 1988 and 1992 to the FPSC list of retirement units and semiannually notified the FPSC of the changes. However, the retirement units used by Florida Power for FPSC purposes did not exceed the limits for retirement units as prescribed by the FERC. Thus, Florida Power's utilization of the FPSC requirements in defining retirement units automatically conformed with the FERC regulatory accounting requirements.[3]

---

[3]An example of the aforementioned regulatory concepts illustrates the accounting principles of the FERC and FPSC. Suppose that P owns five cars. Each car is defined as a retirement unit in the FERC list. The wheels, seats, and other components of the car would be considered minor items of property. Under the FERC, P could add more cars or replace existing cars, and the corresponding costs would be capitalized. The costs of the replacement of the wheels, seats, etc., would generally be considered as expenditures related to minor items of property and generally would be expensed. Theoretically, P could subdivide the car into smaller retirement units, so that the wheels, seats, etc., would be considered separate retirement units. This would increase the amount of capitalized costs because additions or replacements of the wheels, seats, etc., would be required to be capitalized under regulatory rules. However, under the FERC, P is prohibited from increasing the size of the retirement units; i.e., defining a retirement unit to include all five cars. The FPSC has the discretion to allow P to increase the size of the retirement units. This action, if available to P, might theoretically allow all five cars to be identified as one retirement unit; thus, the individual cars might be defined as minor items of property. This would result in an increase in the size of the retirement unit (from one car to five cars), and the amount of costs charged to repair expense
(continued...)

During the years in issue, Florida Power incurred substantial costs related to its electric plants. The expenditures for these costs were recorded as either capital expenditures or repair expenses for regulatory accounting and financial reporting purposes. In preparing its tax returns for the years in issue, petitioner used the same characterization of expenditures for tax reporting purposes that Florida Power did for regulatory accounting and financial reporting purposes, except for specific Schedule M-1, Reconciliation of Income (Loss) Per Books With Income Per Return, adjustments.[4] For the years in issue, petitioner characterized approximately $2.1 billion in expenditures related to Florida Power's electric plants as repair expenses for tax purposes.

During the years in issue, petitioner made Schedule M-1 adjustments on its original tax returns with respect to Florida Power. The Schedules M-1 adjustments for the years 1988 to 1991

---

[3](...continued)
might be increased. However, if P did elect to increase the size of the retirement units under the authority of the FPSC, P would be in violation of the FERC rules prohibiting increases in the size of retirement units. Thus, the retirement units actually used by Florida Power for regulatory accounting purposes conformed with FERC rules.

[4]A Schedule M-1 is a schedule attached to a Form 1120, U.S. Corporation Income Tax Return. It identifies the different treatment of income and expense items for book and tax purposes. See Southwestern Energy Co. v. Commissioner, 100 T.C. 500, 503 n.4 (1993); Orange & Rockland Utils. v. Commissioner, 86 T.C. 199, 205 (1986).

reflected petitioner's election to apply the percentage repair allowance (PRA), a specific tax provision allowing petitioner to deduct as repair expenses a set percentage of expenditures for the repair, maintenance, rehabilitation, or improvement of certain property.  See sec. 1.167(a)-11(d)(2), Income Tax Regs.[5] The Schedule M-1 adjustment for 1992 was for a storm reserve and related to damages caused by Hurricane Andrew.[6]  Other than the variations for the PRA and storm reserve, petitioner used the same characterizations of expenditures for tax purposes that Florida Power did for regulatory accounting and financial reporting purposes.

For the taxable year 1992, petitioner filed two amended returns with claims related to the characterization of expenditures associated with Florida Power.  In its first amended return, filed in September of 1993, petitioner claimed additional storm expenses of $412,042 and an additional repair expense deduction of approximately $4.7 million for cable injection

---

[5]Respondent has alleged that the following amounts were deducted as repair expenses under the PRA for the years 1988 to 1991:

| Year | Amount |
|------|--------|
| 1988 | $28,501,471 |
| 1989 | 29,315,281 |
| 1990 | 28,635,238 |
| 1991 | 25,806,865 |

Petitioner has not disputed these amounts.

[6]The Schedule M-1 adjustment for the storm reserve was in the amount of $6 million.

expenditures.  The storm expenses were accepted by respondent and a portion of the claimed repair expense deduction was allowed by respondent.  In its second amended return, filed in December of 1993, petitioner claimed an additional repair expense deduction of approximately $21 million related to the same type of expenditures currently in issue.  Respondent allowed an additional repair expense deduction for these expenditures in the amount of approximately $11 million.  During the audit of the years 1988 to 1992, respondent proposed to capitalize certain expenditures related to Florida Power that petitioner had reported as deductible repair expenses on its original tax returns.

## Discussion

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials.  See Northern Ind. Pub. Serv. Co. v. Commissioner, 101 T.C. 294, 295 (1993); Shiosaki v. Commissioner, 61 T.C. 861, 862 (1974).  Rule 121(a) provides that either party may move for a summary judgment upon all or any part of the legal issues in controversy.  Full or partial summary judgment is appropriate where there is no genuine issue as to any material fact and a decision may be rendered as a matter of law. See Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994).  Respondent, as the moving party, bears the burden of proving that no genuine

issue exists as to any material fact and that he is entitled to judgment as a matter of law.  See Bond v. Commissioner, 100 T.C. 32, 36 (1993); Naftel v. Commissioner, 85 T.C. 527, 529 (1985). In deciding whether to grant summary judgment, the factual materials and the inferences drawn from them must be considered in the light most favorable to the nonmoving party.  See Bond v. Commissioner, supra at 36; Naftel v. Commissioner, supra at 529.

Once a motion for summary judgment is made and supported, the nonmoving party must do more than merely allege or deny facts in its pleadings, it must "set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, then a decision, if appropriate, may be entered against such party."  Rule 121(d); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Sundstrand Corp. v. Commissioner, supra at 520.  Moreover, summary judgment may be granted if the evidence submitted by the nonmoving party is merely colorable or not significantly probative.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986).

Petitioner argues that some of the factual allegations made by respondent are in dispute.  After reviewing the materials filed by both parties, we find that there is no genuine issue as to any of the material facts that we have set forth in the background section of this opinion.  "Only disputes over facts that might affect the outcome of the suit under the governing law

will properly preclude entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., supra at 248.

Respondent argues that petitioner's attempt to recharacterize as repair expenses, expenditures which it had characterized as capital expenditures, is prohibited under section 446(e) as an impermissible change in accounting method because petitioner did not obtain respondent's consent to recharacterize the expenditures. Respondent claims that, for regulatory, financial, and tax accounting purposes, petitioner consistently followed the regulatory accounting rules and guidelines to determine which expenditures to capitalize and which expenditures to expense at Florida Power's electric plants. Respondent contends that this consistent treatment constitutes petitioner's method of accounting with respect to the expenditures in issue.

Petitioner argues that its method of accounting was to deduct expenditures to the extent allowed under section 1.162-4, Income Tax Regs.,[7] and that the regulatory accounting

[7]Sec. 1.162-4, Income Tax Regs., provides:

 Sec. 1.162-4. Repairs.--The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of

(continued...)

requirements of the FERC and the FPSC were not its method of accounting for purposes of determining the characterization of expenditures at Florida Power's electric plants.  In classifying expenditures as capital expenditures or repair expenses for tax purposes, petitioner claims that it used the amount of repair expenses determined for regulatory accounting and financial reporting purposes as a "reasonable approximation" of the amount of repair expenses allowable for tax purposes.  From there, petitioner claims that it made certain adjustments to increase the deductible repair amount for tax purposes when it became aware that certain expenditures were erroneously classified as capital expenditures.  Petitioner also claims that the recharacterization is a mere "correction" which does not constitute a change in accounting method.  Finally, petitioner implies that respondent's failure to raise the change in accounting method argument when petitioner claimed the additional repair expense deduction for 1992 should prevent respondent from now challenging petitioner's attempted recharacterization.

---

[7](...continued)
the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures.  Repairs in the nature of replacements, to the extent that they arrest deterioration, and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept.

## I.  Method of Accounting

Section 446(a) provides that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." The term "method of accounting" includes both the "over-all method of accounting" and "the accounting treatment of any item." Sec. 1.446-1(a)(1), Income Tax Regs.  A method of accounting includes "the consistent treatment of a recurring, material item, whether that treatment be correct or incorrect." H.F. Campbell Co. v. Commissioner, 53 T.C. 439, 447 (1969), affd. 443 F.2d 965 (6th Cir. 1971).  A taxpayer changes its method of accounting when it changes either the "overall plan of accounting for gross income or deductions" or "the treatment of any material item used in such overall plan."  Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.  A "material item" is "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction." Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 510 (1989); sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.  A change in accounting method may be effected only after consent is obtained from the Secretary.  See sec. 446(e).

"The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: While business expenses are currently deductible, a capital expenditure usually is amortized

and depreciated over the life of the relevant asset".  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 83-84 (1992).  This Court has held that the determination of whether an expenditure constitutes a capital expenditure or a currently deductible expense involves the question of the proper time for taking a deduction.  See Pelaez & Sons, Inc. v. Commissioner, 114 T.C. 473, 489 (2000); Southern Pac. Transp. Co. v. Commissioner, 75 T.C. 497, 683 (1980), supplemented by 82 T.C. 122 (1984); Hooker Indus., Inc. v. Commissioner, T.C. Memo. 1982-357; sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.  An accounting practice involving the timing of when an item is deducted is considered a method of accounting. See GMC & Subs. v. Commissioner, 112 T.C. 270, 296 (1999); Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 797-798 (11th Cir. 1984).

In Southern Pac. Transp. Co. v. Commissioner, supra, we applied section 1.446-1(e)(2)(ii)(b), Income Tax Regs., for purposes of deciding whether the expenditures in issue were for a "material item".  Section 1.446-1(e)(2)(ii)(b), Income Tax Regs., provides that "a correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets which had been consistently treated as an expense in the year of purchase involves the question of the proper timing of an item, and is to be treated as a change in method of accounting."  Although the taxpayer in Southern Pac. Transp. Co. v. Commissioner, supra, was

attempting to change from capitalizing the expenditures in issue to expensing them, the reverse of the situation described in the regulations, we were not convinced of the merit of this distinction and we regarded both situations as examples of changes involving the timing of a deduction. See Southern Pac. Transp. Co. v. Commissioner, supra at 683 n.211. We held that the expenditures that the taxpayer was attempting to recharacterize from capital to expense fit the definition of "material item". Id. at 683.

Although section 446(a) requires a taxpayer to compute his taxable income in the same manner that he computes income in his books, this requirement is not absolute. Courts have permitted variations between financial and tax reporting where other Code requirements, such as sections 162 and 263, are met, and the method of accounting clearly reflects income. See USFreightways Corp. & Subs. v. Commissioner, 113 T.C. 329, 332 (1999). Where the taxpayer is governed by regulatory agencies, the taxpayer is not automatically required to follow the regulatory accounting rules when it reports its activities for tax purposes. See Commissioner v. Idaho Power Co., 418 U.S. 1, 14-15 (1974); Old Colony R.R. v. Commissioner, 284 U.S. 552, 562 (1932). However, while regulatory accounting rules are not binding on a taxpayer, they are necessarily linked with tax accounting, and the consistent practice of applying regulatory rules for tax

reporting purposes cannot be ignored.  See <u>Commissioner v. Idaho Power Co.</u>, <u>supra</u> at 14-15.  In that case, the Supreme Court stated:

> Some, although not controlling, weight must be given to the fact that the Federal Power Commission and the Idaho Public Utilities Commission required the taxpayer to use accounting procedures that capitalized construction-related depreciation.  Although agency-imposed compulsory accounting practices do not necessarily dictate tax consequences, they are not irrelevant and may be accorded some significance. * * * where a taxpayer's generally accepted method of accounting is made compulsory by the regulatory agency <u>and</u> that method clearly reflects income, it is almost presumptively controlling of federal income tax consequences.  [<u>Id.</u> at 14-15; citations and fn. ref. omitted.]

For regulatory accounting and financial reporting purposes, Florida Power followed regulatory rules and guidelines to determine the characterization of expenditures related to its electric plants.  The fact that the regulatory accounting requirements allowed Florida Power some flexibility in defining retirement units does not change this.  The retirement units used by Florida Power for FPSC purposes did not exceed the limits prescribed by the FERC for the years in issue, and petitioner acknowledges that its characterization of expenditures for FPSC purposes "automatically conformed with FERC regulatory accounting principles."  The FERC prohibited public utilities from condensing the FERC list of retirement units or from adding any retirement units that exceeded the size of the FERC retirement units.  Once a retirement unit was established, the cost of

adding or replacing the retirement unit had to be capitalized. Thus, while Florida Power's limited flexibility in defining retirement units could in some cases affect the amounts of capital expenditures or repair expenses, once the retirement unit was identified the regulatory characterization rules requiring capitalization were not flexible. The regulatory rules ultimately determined which expenditures were capitalized and which expenditures were expensed for regulatory accounting and financial reporting purposes.

In Southern Pac. Transp. Co. v. Commissioner, supra, the taxpayer was subject to Interstate Commerce Commission (ICC) accounting rules which required the capitalization of certain expenditures. See id. at 676. For the taxable years at issue, the taxpayer followed the ICC accounting rules and capitalized the expenditures in issue for regulatory and tax purposes. See id. The Commissioner issued a notice of deficiency regarding other issues, and the taxpayer filed a petition with this Court for a redetermination of the deficiency. See id. at 505. In an amended petition, the taxpayer raised, for the first time, the argument that the Commissioner erred in failing to allow the capitalized expenditures as currently deductible expenses. See id. at 677. The Commissioner argued that the taxpayer's attempt to recharacterize the expenditures was an impermissible change in the taxpayer's method of accounting under section 446(e) because

the Commissioner had not consented to the change.  See id. at 680.  We held that, regardless of whether the expenditures were more properly deductible as business expenses under section 162, allowing the taxpayer to deduct such expenditures would result in an impermissible change in method of accounting.  See id. at 687. We found it readily apparent that the taxpayer was seeking to alter the manner in which it had consistently accounted for a recurring, material item.  See id. at 686.  We explained that a change in the treatment of the expenditures involved a question of proper timing; thus, the change in treatment would affect a material item.  See id. at 683.  The taxpayer consistently followed the ICC accounting rules in capitalizing certain expenditures for tax reporting purposes, and its later attempt to recharacterize those expenditures as repair expenses was prohibited, absent consent by the Commissioner.

In Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500 (1989), the taxpayer, for a number of years, determined its ending inventory by selecting a small portion of its inventory cards and using them to approximate the ending inventory.  See id. at 503. Later, the taxpayer completed a physical inventory in which it identified and catalogued all inventory.  See id. at 504.  Based on this thorough examination of inventory, the taxpayer attempted to adjust its opening inventory to reflect the actual amount identified.  See id. at 504-505.  This amount was considerably

larger than the amount determined under the approximation method previously used by the taxpayer.  See id. at 512.  We held that the taxpayer's "change from a seriously flawed and disorganized method * * * to a method of determining both opening and ending inventory * * * on the basis of a complete physical inventory [was] a change in the treatment of a material item and, therefore, [constituted] a change in accounting method."  Id. at 510.  We found that the approximation method of determining inventory, while disorganized and inaccurate, was consistently used by the taxpayer despite his actual knowledge that the inventory amounts were not completely accurate.  See id. at 512.  This consistent practice constituted a method of accounting for determining inventory.  See id.

Petitioner argues that Wayne Bolt & Nut Co. v. Commissioner, supra, does not apply because it involved inventories and they are governed by separate and distinct rules for purposes of determining a method of accounting.  We disagree.  While there are specific regulations which address the accounting treatment of inventories, the basic principles apply for purposes of determining a method of accounting; namely, that a consistent method used to determine the tax treatment of a material item is a method of accounting.  Our holding and reasoning in Wayne Bolt & Nut Co. v. Commissioner, supra, is applicable to the instant case.

The regulatory rules provided the guidelines for determining Florida Power's characterization of expenditures for regulatory accounting and financial reporting purposes. Petitioner consciously chose to use consistently the same characterization for tax purposes that Florida Power did for regulatory and financial purposes.

Petitioner argues that it used the amounts Florida Power reported for regulatory purposes as a "reasonable approximation" for tax purposes rather than reviewing its work orders to determine which expenditures to capitalize and which to expense. Petitioner has made no allegations that it alerted respondent to the fact that it was reporting only approximations and expected to recharacterize expenditures years later. Section 1.446-1(a)(4), Income Tax Regs., provides that the taxpayer's accounting records must be maintained in such a manner as to enable him to file a correct return of his taxable income for each taxable year. One of the essential features that the taxpayer must consider in maintaining such records is:

> Expenditures made during the year shall be properly classified as between capital and expense. For example, expenditures for such items as plant and equipment, which have a useful life extending substantially beyond the taxable year, shall be charged to a capital account and not to an expense account. [Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1332 (1971), affd. 496 F.2d 876 (5th Cir. 1974) (quoting sec. 1.446-1(a)(4)(ii), Income Tax Regs.).]

The FERC and FPSC rules provided a regulatory accounting system which afforded petitioner with a characterization method based on basic accounting principles that generally require the capitalization of expenditures for larger items of property having long-term lives and the expensing of relatively smaller expenditures for minor items needed for repairs.  We note "that the 'decisive distinctions' between current expenses and capital expenditures 'are those of degree and not of kind,' and * * * each case 'turns on its special facts'".  INDOPCO, Inc. v. Commissioner, 503 U.S. at 86 (citation omitted).  Petitioner's attempt to change retroactively from a consistent and logical method of capitalizing the expenditures in issue to expensing them involves the question of proper timing and thus is a material item.  See Southern Pac. Transp. Co. v. Commissioner, 75 T.C. at 683; sec. 1.446-1(e)(2)(ii)(a) and (b), Income Tax Regs.  This attempt to recharacterize the expenditures in issue is to be treated as a change in method of accounting.  See Southern Pac. Transp. Co. v. Commissioner, supra; sec. 1.446-1(e)(2)(ii)(a) and (b), Income Tax Regs.

Petitioner argues that it made certain adjustments related to Florida Power on its Schedules M-1 for the years in issue and that such adjustments establish that petitioner's method of accounting was not simply to follow regulatory and financial accounting for tax reporting purposes.  A Schedule M-1 is a

schedule attached to a Form 1120, U.S. Corporation Income Tax Return. It identifies the different treatment of income and expense items for book and tax purposes. See Southwestern Energy Co. & Subs. v. Commissioner, 100 T.C. 500, 503 n.4 (1993); Orange & Rockland Utils. v. Commissioner, 86 T.C. 199, 205 (1986).

Respondent acknowledges that petitioner made Schedules M-1 adjustments on its tax returns for the years in issue. However, respondent argues that the adjustments do not change the fact that petitioner's method of accounting with respect to the expenditures in issue was to use the regulatory rules and guidelines to determine the proper characterization of expenditures for regulatory, financial, and tax reporting purposes. Respondent claims that the Schedules M-1 adjustments were only for the PRA and the storm reserve. Petitioner does not contend that there were any other Schedules M-1 adjustments.

A.  Percentage Repair Allowance (PRA)

The PRA concept originated in 1971 as part of the Asset Depreciation Range system.[8] The PRA was intended to end controversies concerning whether certain expenditures for repair, maintenance, or improvement of property must be capitalized or

---

[8]In 1981, Congress repealed the entire PRA system effective for property placed in service after Dec. 31, 1980, in taxable years ending after such date. See Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 203, 95 Stat. 221. The PRA continues to be in effect for expenditures which, although incurred after Dec. 31, 1980, are for the repair, maintenance, rehabilitation, or improvement of property placed in service before Jan. 1, 1981.

currently deducted.  See Armco, Inc. v. Commissioner, 88 T.C. 946, 949 (1987); sec. 1.167(a)-11(a)(1), Income Tax Regs.  By electing the PRA, the taxpayer may automatically deduct up to a set percentage of all expenditures for repair, maintenance, rehabilitation, or improvement of "repair allowance property" for the taxable year, as long as such expenditures are not considered "excluded additions".  Sec. 1.167(a)-11(d)(2), Income Tax Regs. Expenditures in excess of the set percentage must be capitalized. See id.  "Under * * * [the PRA] system, certain expenditures which typically would be capitalized can be treated as repair allowances and, thus, deducted as expenses."  United States v. Wisconsin Power & Light Co., 38 F.3d 329, 331 (7th Cir. 1994).

For the years 1988 to 1991, respondent claims that petitioner's repair deductions for tax purposes consisted of the amounts deducted for book purposes, plus Schedules M-1 adjustments for the PRA as follows:

| Year | Book Account | M-1 Adjustment | Tax Return |
|------|------|------|------|
| 1988 | $372,757,769 | $28,501,471 | $401,259,240 |
| 1989 | 385,472,395 | 29,315,281 | 414,839,472 |
| 1990 | 408,077,080 | 28,635,238 | 436,688,025 |
| 1991 | 405,017,292 | 25,806,865 | 430,814,717 |

Petitioner does not dispute respondent's figures, or allege that there were Schedules M-1 adjustments for any other items for 1988 to 1991.

The PRA is a specific tax only provision.  Florida Power did not have the option of using the PRA to determine the

characterization of expenditures for regulatory accounting and financial reporting purposes. The PRA simply allowed petitioner to characterize a set percentage of expenditures as repair expenses for tax purposes.

Petitioner is now trying to recharacterize as repairs, items that it characterized as capital expenditures for tax purposes. Petitioner cannot recharacterize amounts capitalized under the PRA because to do so would violate the percentage limitation. Petitioner does not identify any adjustments in the PRA or claim that it made any error in the original computation under the PRA. The expenditures that petitioner is trying to recharacterize are those that petitioner consistently capitalized for regulatory, financial, and tax reporting purposes. This attempted recharacterization conflicts with petitioner's practice of having tax accounting follow regulatory and financial accounting.

B.   Storm Reserve

On its original 1992 tax return, petitioner made a Schedule M-1 adjustment of $6 million for a storm reserve related to Florida Power. The storm reserve related to an extraordinary item; namely, to offset damages caused by Hurricane Andrew. This was not a recurring item which petitioner accounted for every year, as evidenced by the absence of any Schedule M-1 adjustment for a storm reserve for any of the other years in issue. Additionally, petitioner has not claimed that it is seeking to

recharacterize this item.  The Schedule M-1 adjustment for the storm reserve does not affect petitioner's consistent treatment of characterizing the expenditures in issue based on regulatory rules and guidelines.  Petitioner has not alleged that there were Schedule M-1 adjustments for any other items for 1992.

C.   Audit Adjustments

Petitioner argues that respondent's allowance of additional repair expense deductions on audit supports its position that later recharacterizations were part of its method of accounting. Petitioner contends that the facts that it amended its 1992 return and that respondent allowed additional repair expenses on audit establish that petitioner's method of accounting was not to follow regulatory rules and guidelines when characterizing the expenditures in issue for tax purposes.  Petitioner argues that these adjustments support its position that its accounting practice was to use regulatory characterizations as a "reasonable approximation" and then make adjustments when errors were discovered.

Respondent disputes that the failure to raise the change in method of accounting issue in any way prevents the current disallowance of petitioner's attempted recharacterization. Respondent argues that the audit adjustments were simply part of an overall settlement of the claim and that those actions do not establish the method of accounting that petitioner is claiming.

Petitioner consistently applied the characterizations used by Florida Power for regulatory purposes when reporting for tax purposes. Petitioner made no references in its tax returns that would notify respondent that the amount of claimed repair expenses was a "reasonable approximation" and represented the method of accounting that petitioner is claiming. For the year 1992, petitioner filed two amended returns. In its first amended return, filed in September of 1993, petitioner claimed an adjustment for storm expenses and an additional repair expense for cable injection costs. In its second amended return, filed in December of 1993, petitioner claimed additional repair expenses for the same type of expenditures as those currently in issue and an adjustment for storm expenses. After reviewing the original and amended returns and meeting with petitioner, respondent allowed some of the claimed expenditures to be deducted as repair expenses and accepted the adjustment for storm expenses. Petitioner has not alleged, nor is there any indication, that respondent acquiesced in a method of accounting which would allow petitioner to "approximate" the amount of repair expenses and then file amended returns when, and if, it realized it might have deducted a larger amount. The fact that petitioner amended its 1992 tax return for additional expense claims does not change the fact that, in preparing its original tax return, petitioner consistently used the same

characterizations that Florida Power used for regulatory and financial reporting purposes. Accordingly, we hold that the audit adjustments by respondent do not establish the method of accounting that petitioner is claiming.

Petitioner's treatment of the expenditures in issue for tax purposes was consistent with the treatment of those expenditures by Florida Power for regulatory accounting and financial reporting purposes. The Schedules M-1 adjustments are, at best, relatively minor deviations from petitioner's method of accounting. The Schedules M-1 adjustments for the PRA and the storm reserve, and the audit adjustments by respondent, do not change the fact that petitioner is retroactively attempting to recharacterize expenditures that it regularly and consistently capitalized for regulatory, financial, and tax reporting purposes. See Potter v. Commissioner, 44 T.C. 159, 167 (1965) (methods of accounting must be regular and consistent).

## II. Correction

A change in method of accounting does not occur when a taxpayer seeks to correct mathematical or posting errors, errors in the computation of tax liability, a change in treatment arising from a change in underlying facts, or any other "adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction." Northern States Power Co. v.

United States, 151 F.3d 876, 883 (8th Cir. 1998); sec. 1.446-
1(e)(2)(ii)(b), Income Tax Regs.

Petitioner does not contend that it made errors in
mathematical computations or in the computation of its tax
liability.  Petitioner has failed to make specific allegations
establishing there was a change in underlying facts.

Under section 1.446-1(e)(2)(ii)(b), Income Tax Regs., a
change from capitalizing and depreciating the costs of a class of
depreciable assets to expensing them involves a question of
proper timing.  Petitioner's attempt to recharacterize
expenditures at Florida Power's electric plants, which were
consistently capitalized on its tax returns, fits within the
principles of this regulatory provision.  Although the instant
case is the reverse of the situation set forth in the regulatory
provision, we regard both situations as examples of changes
involving the timing of a deduction.  See Southern Pac. Transp.
Co. v. Commissioner, 75 T.C. at 683 n.211.  Additionally, this
Court has found that the characterization of expenditures as
capital or expense involves the proper time for taking a
deduction.  See Pelaez & Sons, Inc. v. Commissioner, 114 T.C. at
489; Southern Pac. Transp. Co. v. Commissioner, supra at 683;
Hooker Indus., Inc. v. Commissioner, T.C. Memo. 1982-357.

A posting error occurs when there is an error in "the act of
transferring an original entry to a ledger."  Wayne Bolt & Nut

Co. v. Commissioner, 93 T.C. at 510-511 (quoting Black's Law Dictionary 1050 (5th ed. 1979)). Petitioner does not contend that it erred in transferring the amount or characterization of expenditures reported by Florida Power for regulatory purposes to petitioner's tax return. Rather, petitioner relies on Northern States Power Co. v. United States, supra, in arguing that it erroneously capitalized the expenditures at issue and that the attempted recharacterization should be treated as a posting error. Petitioner's reliance on Northern States Power Co. v. United States, supra is misplaced. In Northern States Power Co. v. United States, supra, the taxpayer's tax department was unaware that certain amounts were improperly recorded in its accounts. Because the taxpayer lacked knowledge of the error, it mistakenly capitalized the amounts instead of currently deducting them. See id. at 884. When it discovered the mistake, the taxpayer promptly filed refund claims in an effort to treat the amounts in the same manner that it had consistently treated similar items. See id. The court held that the taxpayer's mistake was more "akin to a posting error" than a change in method of accounting. Id.

In the instant case, petitioner consciously chose to use the same characterization of expenditures for tax reporting purposes that Florida Power used for regulatory accounting and financial reporting purposes. Petitioner gave no notice on its returns

that it was using an "approximation" method and expected to make later corrections. Petitioner's own statements establish that it did not "mistakenly" capitalize the expenditures in issue based on a lack of knowledge of an error. Accordingly, we hold that petitioner's attempted recharacterization of the expenditures in issue was not a posting error. Cf. Wayne Bolt & Nut Co. v. Commissioner, supra at 512.

III. Consent

Petitioner implies that respondent waived the right to contest petitioner's recharacterization of capital expenditures as repair expenses.[9] Petitioner points to the fact that respondent allowed petitioner to reclassify approximately $11 million in capitalized expenditures related to Florida Power as repair expenses for the 1992 taxable year. Prior to this motion, respondent did not raise the change in accounting method argument.

Consent to change a method of accounting is required, regardless of whether the "method is proper or is permitted under the Internal Revenue Code or the regulations thereunder." Sec. 1.446-1(e)(2)(i), Income Tax Regs. In Southern Pac. Transp. Co. v. Commissioner, 75 T.C. at 682, we stated:

---

[9]Petitioner claims that it "is not trying to work an 'estoppel'", but rather that it is simply trying to show that respondent never treated the similarities between regulatory, financial, and tax classifications of capital expenditures and repair expenses as a method of accounting.

In addition, consent is required when a taxpayer, in a court proceeding, retroactively attempts to alter the manner in which he accounted for an item on his tax return.  If the alteration constitutes a change in the taxpayer's method of accounting, the taxpayer cannot prevail if consent for the change has not been secured. * * * [10]

The failure of the Commissioner previously to object to the taxpayer's accounting method will not stop him from later challenging it.  See Niles Bement Pond Co. v. United States, 281 U.S. 357, 362 (1930); Fort Howard Paper Co. v. Commissioner, 49 T.C. 275, 284 (1967); Hotel Kingkade v. Commissioner, 12 T.C. 561, 568-569 (1949), affd. 180 F.2d 310 (10th Cir. 1950).  While the Commissioner's acquiescence in the taxpayer's use of an accounting method is not binding on the Commissioner, it may be a factor in the taxpayer's favor.  See Public Serv. Co. v. Commissioner, 78 T.C. 445, 456 (1982); Geometric Stamping Co. v. Commissioner, 26 T.C. 301, 304-305 (1956).

In the instant case, respondent allowed petitioner certain additional repair expense deductions related to Florida Power. Respondent did not question petitioner's method of accounting or assert that any impermissible change was being made.  Rather,

---

[10]In Summit Sheet Metal Co. v. Commissioner, T.C. Memo. 1996-563, we relied on Southern Pac. Transp. Co. v. Commissioner, 75 T.C. 497 (1980), supplemented by 82 T.C. 122 (1984), in drawing a negative inference against the taxpayer who did not seek to change the treatment of an item on its original tax return or on an amended return, but rather waited until after the Commissioner's audit and after the commencement of court proceedings.

respondent simply reviewed petitioner's claim and allowed an additional deduction based on the circumstances.  Petitioner has not alleged any action on respondent's part which could be construed as approving the method of accounting petitioner is currently claiming for the expenditures in issue.  It is undisputed that petitioner never filed a Form 3115 to request a change in accounting method.  See sec. 1.446-1(e)(3)(i), Income Tax Regs.  Accordingly, petitioner did not obtain respondent's consent to recharacterize the expenditures in issue.

IV.  Purpose of Section 446(e)

The policy underlying section 446(e) was enunciated in Pacific Natl. Co. v. Welch, 304 U.S. 191, 194 (1938):

> Change from one method to the other, as petitioner seeks, would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws.  It would operate to enlarge the statutory period for filing returns * * * to include the period allowed for recovering overpayments * * * . There is nothing to suggest that Congress intended to permit a taxpayer, after expiration of the time within which return is to be made, to have his tax liability computed and settled according to the other method. * * * [11]

---

[11]Since the amendment of the consent requirement in 1954, this passage has been endorsed as an appropriate statement of the policy rationale of sec. 446(e).  See Lord v. United States, 296 F.2d 333, 335 (9th Cir. 1961) ("If * * * [taxpayers] were allowed to report income in one manner and then freely change to some other manner, the resulting confusion would be exactly that which was to be alleviated by requiring permission to change accounting methods"); see also Southern Pacific Transp. Co. v. Commissioner, supra at 686-687 (endorsing and restating the policies articulated by Pacific Natl. Co. v. Welch, 304 U.S. 191 (1938),
(continued...)

In <u>Barber v. Commissioner</u>, 64 T.C. 314 (1975), we identified the following policy reasons served by section 446(e): "(1) To protect against the loss of revenues; (2) to prevent administrative burdens and inconvenience in administering the tax laws; and (3) to promote consistent accounting practice thereby securing uniformity in collection of the revenue." <u>Id.</u> at 319-320 (citations omitted). A comprehensive discussion and analysis of the policy rationale of section 446(e) is found in <u>Diebold, Inc. v. United States</u>, 16 Cl. Ct. 193, 208-209 (1989):

> a central policy underlying the consent requirement is that the Commissioner should have an opportunity to review consent requests in advance. With advance notice, the Commissioner has leverage to protect the fisc, to avoid burdensome administrative uncertainties, and to promote accounting uniformity. If taxpayers generally were permitted to change accounting methods unilaterally, the Commissioner would face the enormous administrative burden of detecting changes and reviewing the propriety of each switch without ready leverage to protect the fisc or promote uniformity.
>
> In the absence of * * * [section 446(e)], a taxpayer could adopt a method of accounting and after several years unilaterally switch to an alternative method which hindsight suggests would have been more financially beneficial. Thus, the Commissioner's ability to protect the fisc and prevent unnecessary variations in accounting procedures would be substantially reduced. In order to avoid missing taxable income, the IRS would be required to multiply its detection and examination efforts to prevent abuse of unconsented retroactive changes. The administrative advantages of advance notice are thus integrally linked to the purposes of protecting the fisc and promoting accounting uniformity.

---

[11](...continued)
and <u>Lord v. United States</u>, <u>supra</u>).

\* \* \* \* \* \* \*

Moreover, the plaintiff in this case desires to make precisely the kind of change that could undermine the purposes of the prior consent rule.  The plaintiff seeks to apply a unilateral change retroactively to cover many past tax years.  If taxpayers were permitted to select the accounting method which best reflects their income over the past four years, only those taxpayers gaining a financial advantage from switching methods would seek refunds.  Thus, uniformity in accounting would become a function of financial advantage and the administrative difficulties of detecting unwarranted unilateral changes would be multiplied.  Moreover, the potential impact on the fisc would be likely to vary unpredictably from year to year.  In sum, the purposes and policies underlying the consent requirement are still served when a taxpayer presumes to change unilaterally from an incorrect to a correct procedure.

Acceptance of petitioner's position would grant petitioner the license to change freely from one characterization to another when hindsight shows that it is financially advantageous. Petitioner waited until 1996 to attempt to recharacterize as repair expenses, expenditures that it had characterized for tax purposes as capital expenditures for the years 1988 to 1992.  It would place an enormous burden upon respondent to detect and review the ramifications of such a change.  For example, petitioner's attempt to recharacterize more than $200 million of expenditures incurred from 1988 to 1992 as deductible repair expenses would require adjustments to petitioner's capital asset accounts for those years and subsequent years.  Adjustments to depreciation deductions taken in the years in issue and subsequent years would be necessary.  The administrative burden

of reviewing the effects of petitioner's recharacterization, such as adjusting for claimed depreciation, would defeat the accounting goal of promoting uniformity, to say nothing of the complex computations and inconvenience in administering the tax laws.  Petitioner's attempted recharacterization is precisely the type of change which frustrates the purpose of section 446(e) and renders the consent requirement necessary.

V.   Conclusion

Petitioner consistently used a method of accounting of following regulatory rules and guidelines for regulatory, financial, and tax reporting purposes for the expenditures in issue.  Petitioner's attempt to alter its classification of the expenditures changes the timing of deductions related to those expenditures and thus is a change in the treatment of a material item.  This change in treatment of a material item does not result from a correction or a change in underlying facts. Petitioner did not seek respondent's consent, nor did respondent impliedly consent or waive the right to challenge petitioner's recharacterization as an impermissible change of accounting method.  Petitioner's claimed recharacterization frustrates the purpose of section 446(e).  Accordingly, we hold that petitioner's attempted recharacterization of the expenditures in

issue is an impermissible change in method of accounting under section 446(e).

An appropriate order will be issued granting respondent's motion for partial summary judgment.